(877 P.2d 451)
No. 70,665

STATE OF KANSAS, *Appellant,* v. AUSTIN GARZA, *Appellee.*
Petition for review denied 255 Kan. 1004 (1994).

Opinion filed July 1, 1994.

*Sara Welch*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, for the appellant.

*Kevin P. Moriarty*, of Moriarty, Erker & Moore, of Overland Park, for the appellee.

Before BRISCOE, C.J., LEWIS and GREEN, JJ.

LEWIS, J.: The defendant stands charged with one count of possession of marijuana with intent to sell and one count of possession of marijuana without a Kansas tax stamp. A motion to suppress certain evidence was filed by the defense, alleging that the evidence was obtained in violation of the defendant's Fourth Amendment rights. The trial court granted the motion to suppress. The State prosecutes this interlocutory appeal from that order. We reverse and remand.

## FACTUAL BACKGROUND

Early on the morning in question, Officers Michael Siebers and Don Poor of the Lenexa Police Department were on patrol in the vicinity of the Days Inn Motel at 95th Street and I-35 in Lenexa. Officer Siebers was particularly skilled in drug enforcement, and, on the night in question, his job was to conduct drug investigations in motels and hotels.

At about 1:00 a.m., the officers observed an individual knocking on the door of room 139 at the Days Inn Motel. At that time, they were in their police vehicle, patrolling the area. They noted there had been problems at this particular motel in the past with drunks trying to get into the wrong rooms. Taking into consideration the hour of the morning, the two officers suspected that the individual knocking at room 139 might become a nuisance to the motel residents and decided to check out the situation. As they pulled into the motel parking lot, they observed that this individual had gotten no response from room 139 and had crossed to the other side of the motel and was now starting to knock on the door of room 136.

Officer Siebers left the patrol vehicle and walked to room 136. When he arrived at room 136, he found the defendant standing in the open doorway of the motel room. The defendant had apparently opened the door in response to the knocking from the individual observed by the police officers. Officer Siebers first

approached the individual who had been knocking at the door and obtained his driver's license, which identified him as Ernest Bjorgaard, Jr. Officer Siebers indicated that he recognized Bjorgaard's name as someone who was reputed to be in the business of selling illegal drugs. After a time, Bjorgaard was removed from the front of room 136 by Officer Poor and is no longer a part of the narrative.

Officer Siebers then turned his attention to the defendant, who had opened the door to room 136. He told the defendant that he was wondering what the other man was doing knocking at the door at such a late hour. He also inquired whether the defendant knew Bjorgaard. The defendant replied, "No, I don't know him." Later, the defendant recanted this statement and said, "Well, yeah, I do recognize him. That's Ernie from the Red Balloon."

Officer Siebers stood in front of the defendant's motel room door in uniform and fully armed. After Officer Poor removed Bjorgaard from the vicinity, Officer Siebers asked the defendant for some identification. The defendant first denied that he had any identification but, under further prodding from the police officer, produced a driver's license identifying him as Austin Garza. The driver's license listed a nonexistent address.

As the officer conversed with Garza, he saw that two other people were in room 136. One was a Hispanic male who was asleep on one of the beds, and the other was a female. The officer asked the defendant who the other male was, and the defendant told him it was his cousin. When the officer asked for the name of the defendant's cousin, the defendant replied, "I don't know. We're distant cousins."

Officer Siebers also inquired about the female in the room. After talking to her for a short time, she produced a Kansas driver's license which identified her as Christy Sue Irwin.

The conversation between Officer Siebers and the defendant lasted for approximately five minutes. During this period of time, the officer stood on the public walkway in front of the motel room. The record indicates that at no time did the police officer breach the threshold of the motel room door. By and large, the conversation between the officer and the defendant appears to have been polite and brief. No threats of arrest or other police action were made. The defendant terminated the conversation by

saying, "I know what you are doing, and if you don't have a search warrant, I'm closing the door." Officer Siebers replied, "I don't have a warrant." The defendant abruptly terminated the encounter by shutting the motel room door in the officer's face.

During his conversation with the defendant, Officer Siebers noted a number of things he considered to be suspicious. Among these were the defendant's denial, and later admission, that he had an identification card, his contradictory statements about knowing Bjorgaard, and his reference to the other male as a "distant cousin." The officer also observed a towel lying along the bottom of the motel room door. This towel, accompanied by the presence of Bjorgaard, made the officer somewhat suspicious that illicit drugs may have been used in the room. After the defendant shut the door in Officer Siebers' face, the officer stepped aside and heard the toilet flush three or four times. This indicated, he testified, that if there were drugs in the room, they were being rapidly disposed of.

Officer Siebers then proceeded to check to determine whether there were any wants or warrants outstanding on the defendant. The computer check indicated that there was a failure to appear warrant issued for Austin Garza by the Kansas City, Kansas, authorities. After determining this was still an active warrant and that the Kansas City authorities were still seeking Garza, the officer then knocked, for the first time, on the door to room 136. The defendant answered the knock and was shortly thereafter arrested on the outstanding warrant.

After Garza had been arrested, room 136 was searched. The drugs in question were found by the use of a police dog and were found not in the motel room but in the automobile of Christy Sue Irwin.

The defendant has no ownership or other possessory interest in the automobile of Christy Sue Irwin. However, the trial court apparently concluded that the detention of the defendant prior to his arrest led to the discovery of the drugs. Those drugs were determined by the trial court to be "fruit of the poisonous tree" and were suppressed. The essential question is whether the defendant's Fourth Amendment rights were violated by the conversation between the defendant and Officer Siebers, which took place prior to the defendant's arrest. If those rights were violated,

the motion to suppress was correctly decided; if not, the trial court erred in suppressing the evidence.

## WAS THE DEFENDANT SEIZED BY THE AUTHORITIES?

The trial court made no findings of fact in resolving the motion to suppress. The only indication we have of the trial court's reasoning is in its journal entry of October 28, 1993, in which it held:

"Thereupon, the Court, having heard evidence on the defendant's motion to suppress and arguments of counsel, finds that the defendant's motion to suppress should be sustained. Specifically, the Court finds that the police had no articulable suspicion or conduct observed upon which to base the detention that occurred which obviously led to the discovery of illicit substances."

It appears that the detention referred to by the trial court is that approximately five-minute period of time in which the defendant stood inside the open door to his motel room and conversed with Officer Siebers. If that encounter was not a "seizure" of Fourth Amendment significance, then the order of suppression was improvidently granted.

We begin by observing that not all encounters between the police and citizens involve a "seizure" in the constitutional sense of the word. There are numerous cases holding that even though an officer may have no basis for suspecting a particular individual, the officer may still ask general questions of that individual. It is relatively well settled that, under most circumstances, the officer has the right to ask a citizen for identification without effecting a seizure. See *Florida v. Rodriguez*, 469 U.S. 1, 5-6, 83 L. Ed. 2d 165, 105 S. Ct. 308 (1984); *INS v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984); *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). In *State v. Marks*, 226 Kan. 704, 709-10, 602 P.2d 1344 (1979), our Supreme Court held that approaching two individuals in a motor vehicle and asking for identification did not amount to a seizure.

We must first determine whether the encounter between Officer Siebers and the defendant was a seizure implicating the defendant's Fourth Amendment rights or a consensual encounter which does not implicate those rights. We conclude that the

encounter was consensual in nature and that the Fourth Amendment rights of the defendant were never implicated.

In *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985), our Supreme Court indicated: "Whenever a police officer accosts a person and restrains his freedom, he has 'seized' that person." Since *Epperson* was decided, the United States Supreme Court has spoken to the question at hand and laid down guidelines for determining whether a seizure has taken place. One of the most recent decisions is *Florida v. Bostick*, 501 U.S. 429, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991). In that case, Florida authorities had searched Bostick's luggage in a random search of a bus. The Florida Supreme Court held that all bus searches were per se unconstitutional. The United State Supreme Court reversed that decision. Discussing whether an encounter was consensual or not, the Court indicated:

"Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' *California v. Hodari D.*, 499 U.S. 621, 628[, 113 L. Ed. 2d 690, 111 S. Ct. 1547] (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio*, 392 U.S. 1, 19, n. 16[, 20 L. Ed. 2d 889, 88 S. Ct. 1868] (1968): 'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'

"Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure. In *Florida v. Royer*, 460 U.S. 491 (1983) (plurality opinion), for example, we explained that 'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' [Citations omitted.]

"There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure. The Court has dealt with similar encounters in airports and has found them to be 'the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest.' *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984). We have stated that *even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, INS v. Delgado*, 466 U.S. 210, 216 (1984);

*Rodriguez,* [469 U.S.] at 5-6, *ask to examine the individual's identification,* see *Delgado,* [466 U.S.] at 216; *Royer,* [460 U.S.] at 501 (plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 557-558[, 64 L. Ed. 2d 497, 100 S. Ct. 1870] (1980); and request consent to search his or her luggage, see *Royer, supra,* [460 U.S.] at 501 (plurality opinion)—as long as the police do not convey a message that compliance with their requests is required." (Emphasis added.) 501 U.S. at 434-35.

The Court also said:

"The present case is analytically indistinguishable from *Delgado.* Like the workers in that case, Bostick's freedom of movement was restricted by a factor independent of police conduct—*i.e.,* by his being a passenger on a bus. Accordingly, the 'free to leave' analysis on which Bostick relies is inapplicable. *In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.* This formulation follows logically from prior cases and breaks no new ground. We have said before that the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' *Chesternut,* [489 U.S.] at 569. See also *Hodari D.,* 499 U.S., at 628." (Emphasis added.) 501 U.S. at 436-37.

Finally, the Court defined the rules to be applied in determining whether a particular encounter is or is not a seizure:

"We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. That rule applies to encounters that take place on a city street or in an airport lobby, and it applies equally to encounters on a bus. The Florida Supreme Court erred in adopting a *per se* rule." 501 U.S. at 439-40.

In *Florida v. Royer,* 460 U.S. at 502, 514, the Court adopted a rule that Fourth Amendment protections apply when "official authority" is exercised "such that 'a reasonable person would have believed he was not free to leave.'" The rules in *Bostick* and *Royer* apply in different situations, and the question is either whether a reasonable person would have believed he or she was

not free to leave and/or whether a reasonable person would have believed he or she was not free to decline an officer's request or otherwise terminate the encounter.

In *U.S. v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993), the Eighth Circuit said:

"For purposes of the Fourth Amendment, a person is seized when officers restrain a person's liberty through physical force or a show of authority. [Citation omitted.] *The Fourth Amendment is not implicated, however, when officers merely approach and question a person, as long as the encounter is consensual in nature and does not involve coercion or restraint of liberty. Id.; United States v. Dennis, 933 F.2d 671, 673 (8th Cir. 1991) (per curiam). Even without a basis to suspect a person, officers may ask to see the person's identification and request consent to search the person's luggage if the officers do not convey a message that the person must comply. United States v. Todd, 963 F.2d 207, 210 (8th Cir. 1992). A seizure occurs if, based on all the circumstances of the encounter, a reasonable person would not feel 'free to decline the officer's requests or otherwise terminate the encounter.' United States v. Wright, 971 F.2d 176, 179 (8th Cir. 1992)."* (Emphasis added.)

In *Jones,* the court indicated, "In this case, there is nothing to suggest Sola and Scudder restrained Jones during the encounter in the train compartment. *Jones opened her door and agreed to talk to Sola.*" (Emphasis added.) 990 F.2d at 408. Later, the court observed, *"Jones could have ended the encounter by shutting the door, . . . and, indeed, Jones testified she was free to close the door at all times."* (Emphasis added.) 990 F.2d at 408. The *Jones* court concluded there was no seizure of Jones and reversed the trial court's order suppressing the cocaine seized from her luggage. See *United States v. Little,* 18 F.3d 1499 (10th Cir. 1994). The logic employed is applicable here.

We adopt the rules indicated by the decisions cited above, particularly the approach taken in *Florida v. Bostick.* In order to determine whether a particular encounter was a seizure implicating Fourth Amendment rights, a court must consider the totality of the circumstances shown. If the individual's freedom of movement is restricted by a factor independent of police conduct, the appropriate inquiry is whether a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter. If the individual's freedom of movement is not restricted by circumstances independent of police conduct,

the question then becomes whether a reasonable person would have believed he or she was not free to leave. In *Bostick*, the court refused to apply the "free to leave" test because the encounter took place in a bus on which the defendant was a passenger. As a result, the defendant's freedom of movement was restricted by a factor independent of police conduct.

This case is similar to *Bostick*, *United States v. Jones*, and *United States v. Little*. Here, the defendant was in a motel room, which did restrict his freedom of movement. As a practical matter, the defendant could not "leave" the motel room with impunity. This restriction of his freedom was independent of the police conduct. For that reason, the question is whether, under all of the circumstances shown, a reasonable person would have felt free to decline Officer Siebers' requests or to terminate the interview with the police officer.

We have examined the totality of the circumstances of this case, and we conclude that, prior to his arrest, the defendant was never "seized" in the constitutional sense. The circumstances which surround the encounter are of some importance. The door to the motel room was opened by the defendant in response to the knocking by Bjorgaard. The door was open when Officer Siebers arrived, and the defendant was standing in the open doorway. There was no police action involved in gaining entry to the motel room or in opening the door to the motel room. The encounter in the doorway of the motel room was brief, lasting no more than five minutes, and the police officer never crossed the threshold of the door. The questions asked were not incriminating, nor were they particularly penetrating. The officer asked for identification of the defendant and his companions, nothing more. When the questioning began making the defendant uncomfortable, he promptly terminated the interview and shut the door in the officer's face. The record clearly shows that a reasonable person would have felt free to terminate the interview. Here, the facts show that not only did the defendant feel free to terminate the encounter, he did so by unceremoniously shutting the door in the. face of the police officer. Based on the reasoning in *Bostick* and in view of the totality of circumstances shown, we hold that there was never a seizure of the defendant in the constitutional sense prior to his arrest. The holding by the

trial court to the contrary is error. We reverse the decision of the trial court on the motion to suppress and remand the matter for trial.

In their briefs, the parties discuss whether the defendant has standing to object to the search of his companion's automobile. We will not resolve that issue on this appeal. It is left to be resolved by the trial court if and when it is raised.

We hold there was no seizure of the defendant prior to his arrest; it follows that the seizure of the evidence could not be the "fruit of the poisonous tree" since that tree does not exist under these facts.

The defendant emphasizes that this encounter took place in a motel room which is, in essence, a dwelling. We concede that the expectation of privacy in a motel room is nearly equal to that of a dwelling. The issue on this appeal has little to do with the expectation of privacy or with the location of the encounter. This is explained by the Tenth Circuit Court of Appeals in *United States v. Little*, 18 F.3d at 1505, as follows:

"We need not determine the precise level of any 'higher' expectation of privacy in a train roomette, however, because any such expectation of privacy has only a limited relevance to the question of whether a police-citizen encounter in such a roomette is consensual. 'While a person's "higher expectation of privacy" in his or her train compartment would have some relevance if we were reviewing a search of the compartment, it has limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate the encounter.' *United States v. Bloom*, 975 F.2d 1447, 1453 n. 6 (10th Cir. 1992)."

We agree with the reasoning of the Tenth Circuit as set forth above. The location of this particular encounter has little to do with the ultimate question of whether the encounter was of Fourth Amendment significance.

We also believe that our decision is consistent with that of *State v. Marks*, 226 Kan. at 709-10, wherein our Supreme Court said:

"For purposes of the Fourth Amendment, the reasonableness of a seizure of a person that is less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. [Citations omitted.] We have concluded that the holding in *Brown v. Texas* is not applicable to the case now before us. Here officer Stovall did not stop the automobile

in which the defendant and Willie Richardson were seated; the automobile was parked at the time the officer first observed it. Officer Stovall did not approach the defendant to arrest him or to search him. *There was no stopping or detention of the defendant and, hence, there was no seizure. Under all of the factual circumstances, we hold the police officer had the right to approach the defendant in the car for the purpose of questioning defendant in the course of a criminal investigation."* (Emphasis added.)

In this case, the defendant was standing in his open motel room doorway when the officers first encountered him. They had the right to question the defendant and ask for identification. This was a consensual encounter, and the defendant's Fourth Amendment rights were not implicated.

The parties have spent some time in their briefs discussing the question of whether the police officers had a reasonably articulable suspicion sufficient to justify detaining the defendant. In view of our holding that no such detention or "seizure" took place, this issue is moot and will not be dealt with in this opinion.

Reversed and remanded.