(105 P.3d 730)
No. 92,307

STATE OF KANSAS, *Appellant*, v. ANGELA C. KERMOADE and
GEORGE GEFFREY MOYER, JR., *Appellees*.

Opinion filed February 11, 2005.

*Erica K. Schoenig* and *Steven J. Obermeier*, assistant district attorneys, and *Phill Kline*, attorney general, for appellant.

*Paul W. Burmaster*, of Overland Park, for appellees.

Before MCANANY, P.J., MALONE, J., and LARSON, S.J.

LARSON, J.: In this interlocutory appeal, the State appeals the trial court's granting of Angela C. Kermoade's and George Geffrey Moyer, Jr.'s joint motion to suppress evidence obtained from a search of their residence. We agree with and affirm the trial court.

This appeal, like all involving suppression issues, is fact sensitive, and we first set forth in detail the facts as developed by the suppression hearing.

In December 2002, Officer Donald VanHoose and Detective Jess Rollwagon seized marijuana plants and equipment from the home of Randall Sandusky. Sandusky agreed to be an informant and told the officers he believed there was marijuana growing in a house across the street that belonged to "Angie" and "Geff." He also said Brian Spradling was growing marijuana in the same house. Neither Spradling nor the defendants herein had been under in-

vestigation. Testimony at the suppression hearing showed the officers considered Sandusky to be unreliable.

Later the same night the two officers and Sergeant Brian Wessling, all dressed in plain clothes, went to the defendants' home. VanHoose's badge was worn around his neck and was visible. VanHoose and Rollwagon went to the porch and Wessling was at the corner of the house. There were no visibly marked patrol cars. It was cold.

VanHoose knocked on the door. Kermoade answered and opened the door only slightly. VanHoose explained why they were there and asked for permission to come in. Kermoade said no. In response, VanHoose asked her to step outside to talk to them. Kermoade complied with the request and stepped outside on the porch but shut the door behind her. According to Rollwagon, Kermoade "acted like she didn't want to come out the door."

VanHoose told Kermoade they were investigating her neighbor, Spradling, and they believed he was growing marijuana in her home. He told her he was there to "get" her consent to search her home. According to VanHoose, "[s]he obviously had some questions about that. She was not comfortable with that." Kermoade made it clear she did not want the officers to enter her home.

The officers then explained that if she did not consent they would apply for a search warrant and it would be up to the judge to grant or deny the request. Kermoade was told that the officers would "secure" the residence and although people would be free to leave, those remaining would have to be in the presence of an officer.

Kermoade told the officers she wanted to talk to her husband, Moyer, as she had questions about her decision. She went back inside her home but in doing so, the front door remained cracked open as much as 6 inches. Kermoade went downstairs out of the officers' view in the split level home.

According to the officers, they did not attempt to enter the house without permission. After Kermoade was inside for several minutes, the officers became concerned because they did not know what was going on in the home. The officers testified they did not have concerns for their safety. Rollwagon thought the residents

might destroy evidence, but they did not hear a shredder, a toilet flush, or a garbage disposal run. The officers said they believed they smelled fresh marijuana while standing on the porch. For these reasons, Rollwagon yelled for Geff and Angie to come to the front door. Rollwagon said he did not push open the door when calling for defendants, although VanHoose acknowledged that at the preliminary hearing he had said that Rollwagon had swung the front door open.

The defendants came up the stairs. The officers said they were let in. There was testimony they were already inside the home. The officers did not perform a protective sweep of the home or look for other people in the home. The officers and defendants sat down in the living room and had an extended conversation. The search warrant process was explained again and the officers did not express an opinion as to whether they could obtain a warrant. Rollwagon reminded the defendants that decision would be up to a judge. Defendants inquired whether they had a right to refuse to give consent and the officers explained that the defendants did have the right to refuse.

The living room conversation lasted approximately 30 minutes. The defendants were not threatened, yelled at, or told they had to consent. At some point, the officers obtained the names of two other people in the house and allowed them to leave. At the end of the conversation, Kermoade asked Moyer, "What do you think?" Moyer responded that he thought they should cooperate. Defendants gave the officers consent to search the home, both verbally and in writing.

Defendants escorted the officers to the basement where marijuana plants and equipment to facilitate their growth was found. Defendants agreed to talk to the officers and disclosed information about the growing operation and Spradling.

Kermoade and Moyer were charged with cultivating marijuana in violation of K.S.A. 65-4105(d)(16) and K.S.A. 65-4163(a) and possession of drug paraphernalia in violation of K.S.A. 65-4152. Defendants moved to suppress, claiming the consent was not voluntarily given but coerced following the officers' unlawful intrusion into their home. In response, the State maintained the encounter

was consensual, did not constitute a seizure, and the consents were voluntary.

The testimony at the suppression hearing from the three officers was similar to the facts previously set forth. VanHoose testified the defendants were free to leave during the living room conversation. Rollwagon said he would have complied if the defendants had asked him to leave. VanHoose did concede that his impression of Sandusky was that "he was not the most reliable individual." He said he would not have based a search warrant application solely on Sandusky's information. It was for that reason the officers knocked on the defendants' door.

Neither defendant testified, but the defense called Tindaro Nioci to testify regarding the officers' actions. He was visiting the defendants' home during the events in question and was one of the two individuals later allowed to leave. Nioci testified that as he came up from the lower level and walked to the kitchen to get a drink of water, he passed Kermoade while she was headed downstairs. At that time, he did not see anyone near the door. But, when he left the kitchen to go back downstairs, he saw three men standing inside the front door.

### Ruling of the trial court

The trial court granted the defendants' motion to suppress. The court characterized the encounter as a "knock and talk" fishing expedition that is frequently fruitful. With the admission that the informant was not trusted, the trial court said no disinterested, detached magistrate would give a search warrant.

Kermoade was characterized as exhibiting a fair amount of legal acumen and did not want the officers in the home and said, "there was a denial of the consent search from the git-go." When a citizen is asked to come out on the front porch after denying entry one has to wonder how freely and voluntary that was. The court said at this point the "knock and talk" turned to a "knock and twist the arm out of the socket" because they would not take "no" for an answer.

The trial court stated that once Kermoade went downstairs the officers had nothing to assist them. They wanted to see the occu-

pants so they yelled at them to come back upstairs. This goes to the question of voluntariness and freedom in giving the consent. The court stated the burden was on the State to show the consent was voluntarily given "and this one was extracted like a dentist pulls a bad tooth."

In discussing the "we'll come back after making an application for a search warrant" statement, the trial court pointed out officers cannot leave the impression you are absolutely entitled to obtain a search warrant. Here, the defendants were told the house was going to be "secured" and anybody there was going to have to stay in the immediate presence of a police officer. There still was nothing credible to justify a search warrant and the judge said:

"So what props it up? Well, the smelling of the unburned marijuana. I'm going to say that the officers were carried away with the enthusiasm of the moment in believing they smelled the unburned marijuana. I attach little probative value to that testimony.

"The bottom line of this is that this is in the Court's mind a bad search. It is not a consent search. There were no exigent circumstances There was no search warrant. I would have to speculate as to whether a disinterested magistrate would have given a search warrant based on the facts that were known to the officers at that time."

The court granted the defendants' motion and ordered all the evidence and statements therefrom suppressed.

From this ruling, the State has taken an interlocutory appeal.

### *Did the trial court err in granting defendants' suppression motion?*

The State contends Kermoade's contact with the officers was a consensual encounter and never became a seizure. The State further argues the consent to search was voluntary and, therefore, valid. The defendants principally argue for several reasons that the trial court was correct and should be affirmed.

The defendants point to and heavily rely on the standard of review restated in *State v. Rexroat*, 266 Kan. 50, 54-55, 966 P.2d 666 (1998), and arising from Justice Allegrucci's summary in *State v. Ruden*, 245 Kan. 95, 105, 774 P.2d 972 (1989):

" 'An individual may waive the requirement of a search warrant or consent to a search without a warrant, but the State has the burden to show such consent or

waiver is voluntarily, intelligently, and knowingly given. *State v. Jakeway*, 221 Kan. 142, Syl. ¶ 4, 558 P.2d 113 (1976). The existence and voluntariness of a consent to search and seizure is a question of fact that the trier of fact must decide in light of the totality of the circumstances; the trial court's decision will not be overturned on appeal unless clearly erroneous. *State v. Buckner*, 223 Kan. 138, 144, 574 P.2d 918 (1977). The State must prove voluntariness by a preponderance of the evidence. 223 Kan. at 143.' "

It is also important, as was said in *State v. Morris*, 27 Kan. App. 2d 155, Syl. ¶ 1, 999 P.2d 283 (2000), that "[t]he Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights have been found to give special deference to the sanctity of privacy in an individual's home." See *State v. Platten*, 225 Kan. 765, 769, 594 P.2d 201 (1979).

Our standard of review is well known that when reviewing a motion to suppress evidence, an appellate court determines whether the factual underpinnings of the district court's decision are supported by substantial competent evidence. The appellate court does not reweigh the evidence. The ultimate legal conclusion drawn from those facts is a legal question requiring de novo review. *State v. Vandervort*, 276 Kan. 164, 169, 72 P.3d 925 (2003). Further, when a motion to suppress evidence is filed, the State bears the burden of establishing the lawfulness of the search and seizure. *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003).

"There are three types of police-citizen encounters: arrests, investigatory stops, and voluntary encounters." *State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994). Investigatory stops require reasonable suspicion of criminal activity. *State v. Toothan*, 267 Kan. 412, 417-18, 985 P.2d 701 (1999); see K.S.A. 22-2402(1). By contrast, voluntary encounters are not considered seizures; as such, they do not implicate the Fourth Amendment. *Crowder*, 20 Kan. App. 2d at 119. A voluntary encounter may transform into an investigatory detention, however. See *State v. Grace*, 28 Kan. App. 2d 452, 458-59, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001).

The trial court properly characterized the initial encounter as a lawful "knock and talk." Such an encounter is consensual and consists of one or more officers approaching an individual and asking questions of him or her. See *State v. Dwyer*, 28 Kan. App. 2d 238,

239-40, 14 P.3d 1186 (2000), *rev. denied* 270 Kan. 900 (2001) (politely and calmly executed "knock and talk" conversation outside apartment did not constitute investigatory detention). The question we face is whether the encounter remained consensual or became transformed into a seizure. The trial court found that it became a seizure and we agree.

A court looks to the totality of the circumstances to determine whether a particular encounter constitutes a seizure implicating Fourth Amendment rights. *State v. Garza*, 19 Kan. App. 2d 825, Syl. ¶ 4, 877 P.2d 451, *rev. denied* 255 Kan. 1004 (1994). The test of whether a seizure has occurred is based on whether a reasonable person would have felt free to decline an officer's request or otherwise terminate the encounter. 19 Kan. App. 2d at 832-33.

The trial court here correctly determined the consensual encounter began its transformation into a seizure when the officers asked Kermoade to step outside her home. As the trial judge stated: "Now, at this point, I think that in [*sic*] whole thing degenerates from a 'knock and talk' to a 'knock and twist the arm out of the socket' because they wouldn't take no for an answer, they wanted to search." Although the officers allowed Kermoade to go back into the house to talk with her husband, within several minutes they were yelling at them to come to the door. The testimony that if the request was denied that an officer would remain with each occupant of the home further shows neither defendant was free to leave.

The trial court's findings that a seizure occurred are supported by substantial competent evidence and we will not reweigh that evidence. *Vandervort*, 276 Kan. at 169. The movement of both defendants was restricted and controlled. This was not a brief encounter, lasting well over 30 minutes. Viewed by a totality of the circumstances, the officers' actions appeared coercive such that a reasonable person would not feel free to disregard the officers' "order" to return to the front door.

When the legality of the seizure is considered, the trial court properly found there was no lawful reason to detain the defendants, as the officers "had nothing other than the unreliable testimony or statements of a described untrustworthy informant." The lack of

corroborating information resulted in the officers going on their "fishing expedition" to defendants' house. We conclude, as the trial court did, that the encounter between the defendants and the officers transformed into an unreasonable seizure.

However, a person may waive his or her Fourth Amendment protection against unreasonable searches and seizures. *Crowder*, 20 Kan. App. 2d at 120, relying on *State v. Miles*, 206 Kan. 748, 751, 481 P.2d 1020, *cert. denied* 404 U.S. 956 (1971). Therefore, although we have found the encounter between the officers to have become an unreasonable seizure, we must still consider if the subsequent consent to search was voluntary and whether the consent purged the taint of the illegal detention.

As the defendants convincingly have pointed out to us in language from *Wilson*, voluntariness is determined from the totality of the circumstances and is a question of fact. And, the trial court's findings are not to be overturned on appeal unless *clearly erroneous. State v. Wilson*, 30 Kan. App. 2d 100, Syl. ¶ 7, 39 P.3d 668 (2002). *Wilson* further teaches us that the essential inquiry in determining the voluntariness of the consent is whether it was the product of the accused's free and independent will. 30 Kan. App. 2d at 108.

There are several reasons why the trial court's ruling on the voluntariness issue must be affirmed. The trial court analyzed the totality of the circumstances and in holding the consent was not voluntary or freely given characterized that consent as "extracted like a dentist pulls a bad tooth." The officers' persistence totally overcame the defendants' will. The officers said they were there to "get" the defendants' consent to search. Based on a clearly erroneous standard of review, we easily and unequivocally must affirm the trial court's finding.

The other hurdle the State must transcend is that "[w]hen a consent to search is preceded by a Fourth Amendment violation, the State, in addition to proving the voluntariness of the consent, must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *State v. Schmitter*, 23 Kan. App. 2d 547, Syl. ¶ 8, 933 P.2d 762 (1997); see *Wilson*, 30 Kan. App. 2d at 106. Under our facts the entire topic of the

conversation was the officers' drive to obtain the consent. There was no sufficient intervening time or event to purge the taint of the defendants' illegal detention.

Finally, there were no outside circumstances such as evidence destruction or activity that caused the officers to take any action other than pursue the continuing attempt to obtain a consent to search.

The trial court is affirmed.

MALONE, J., concurring: The majority opinion begins by repeating the long-held standard of review by Kansas appellate courts that the existence and voluntariness of a consent to search and seizure is a question of fact to be decided in light of the totality of the circumstances and will not be overturned on appeal unless clearly erroneous. *State v. Rexroat*, 266 Kan. 50, 54-55, 966 P.2d 666 (1998); *State v. Johnson*, 253 Kan. 356, 364, 856 P.2d 134 (1993); *State v. Ruden*, 245 Kan. 95, 105, 774 P.2d 972 (1989); *State v. Pearson*, 234 Kan. 906, 920, 678 P.2d 605 (1984); *State v. Buckner*, 223 Kan. 138, 144, 574 P.2d 918 (1977); *State v. Jakeway*, 221 Kan. 142, 146, 558 P.2d 113 (1976); *State v. Wilson*, 30 Kan. App. 2d 100, 108, 39 P.3d 668 (2002); *State v. Kriegh*, 23 Kan. App. 2d 935, 938, 937 P.2d 453 (1997). I write this separate opinion to express my view that this standard of review is misleading. When the factual underpinnings concerning the voluntariness of a consent to search are disputed, the appellate court should give deference to the trial court's determination of the facts. However, the ultimate determination of the voluntariness of a consent to search is a legal conclusion which should be subject to de novo review.

Generally, when reviewing a motion to suppress evidence, the appellate court determines whether the factual underpinnings of the trial court's decision are supported by a substantial competent evidence standard. However, the ultimate legal conclusion drawn from those facts is a legal question requiring the appellate court to apply a de novo standard of review. *State v. Vandervort*, 276 Kan. 164, 169, 72 P.3d 925 (2003). Kansas appellate courts recognize that when the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether

to suppress is a question of law over which the appellate court has unlimited review. *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003).

Although this general standard of review on a motion to suppress evidence is clear, Kansas appellate courts seem to have created an exception for the issue of voluntariness of a consent to search. Kansas appellate courts consider this determination to always be a question of fact which will not be overturned on appeal unless clearly erroneous. However, as with any motion to suppress evidence, if the underlying facts are undisputed, the determination of the voluntariness of a consent to search is a legal conclusion to be drawn from the facts. To the extent that Kansas appellate courts consistently fail to draw this distinction, I believe the applied standard of review on consent to search cases is inaccurate.

I agree that the State has the burden of proving the voluntariness of a consent to search. Also, the determination of the voluntariness of a consent to search must be made in light of the totality of the circumstances. Nevertheless, if the evidence is undisputed, the appellate court can consider the totality of the circumstances as well as the trial court.

Kansas appellate courts consistently hold the determination of the voluntariness of a confession is a legal question requiring independent appellate review. In reviewing a trial court's ruling on a motion to suppress a confession, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard; the appellate court reviews the ultimate legal decision drawn from those facts de novo. To determine whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. *State v. Makthepharak*, 276 Kan. 563, 566-67, 78 P.3d 412 (2003); *State v. White*, 275 Kan. 580, 597, 67 P.3d 138 (2003). If the issue of the *voluntariness of a confession* is a legal question subject to de novo review, why is the *voluntariness of a consent to search* a question of fact subject to a clearly erroneous standard? Both determinations are made based upon the totality of the circumstances.

I submit that Kansas appellate courts apply the correct standard of review on the issue of the voluntariness of a confession. The

same standard of review should be applied on the issue of the voluntariness of a consent to search. The appellate court should review the trial court's determination of the facts under a substantial competent evidence standard without reweighing the evidence. However, the ultimate determination of the voluntariness of a consent to search is a legal conclusion to be drawn from the facts and should be subject to de novo appellate review.

In this case, however, I agree with the majority opinion that the trial court's judgment suppressing the evidence should be affirmed. This case involved disputed facts. The evidence was disputed among the officers themselves as to whether they pushed open the door while waiting on the front porch. More importantly, the evidence was disputed as to whether the officers entered the residence without permission. Judging from the trial court's comments, it appears that the trial court did not believe the officers' version of the facts. Giving appropriate deference to the trial court's determination of disputed facts, the ultimate conclusion that the State failed to prove the voluntariness of the consent to search the residence should be affirmed.